**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| NOVAN, INC., *et al.*,[1] | ) |
| | ) Case No. 23-10937 (LSS) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |
| | ) **Hearing Date**: TBD |
| | ) **Bid Procedures Objection Deadline**: TBD |
| | ) **Private Sale Objection Deadline**: TBD |
| | ) |

**MOTION OF DEBTORS FOR ENTRY OF ORDERS (I)(A) APPROVING BIDDING
PROCEDURES FOR SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS FREE AND
CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES AND DESIGNATING
LIGAND PHARMACEUTICALS AS A STALKING HORSE BIDDER, (B) SCHEDULING AN
AUCTION AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF,
(C) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES AND
(D) SCHEDULING A SALE HEARING AND APPROVING THE FORM AND MANNER OF
NOTICE THEREOF; (II)(A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE
AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES AFTER THE
AUCTION AND (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF
EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) IN THE
ALTERNATIVE, APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND
CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES TO LIGAND
PHARMACEUTICALS IF NOT APPROVED AS THE STALKING HORSE BIDDER**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

hereby submit this motion (the "Motion"), pursuant to sections 105, 363, 365, 503, and 507 of

title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, and 6006 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local

Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

District of Delaware (the "Local Rules"), for entry of:

(a)     an order, substantially in the form attached hereto as Exhibit A (the "Bidding
        Procedures Order"): (i) approving bidding procedures, substantially in the form
        attached to the Bidding Procedures Order as Exhibit 1 (the "Bidding
        Procedures"), to be used in connection with one or more sales (each a "Sale") of

---

[1]     The Debtors in these chapter 11 cases, along with the last four digitals of the Debtors' federal tax identification
        number (if applicable), are: Novan, Inc. (7682) and EPI Health, LLC (9118).  The corporate headquarters and
        the mailing address for the Debtors is 4020 Stirrup Creek Drive, Suite 110, Durham, NC 27703.

the Debtors' development and commercialization rights to their research and development portfolio (the "R&D Assets") and to the rights to commercialize the Debtors' commercial portfolio (the "Commercial Assets" and together with the R&D Assets, the "Assets," as more fully defined in the Bidding Procedures) free and clear of all liens, claims, interests, and encumbrances; (ii) authorizing the Debtors to designate one or more affiliates of Ligand Pharmaceuticals, Incorporated or its designee ("Ligand") as the Stalking Horse Bidder (as defined herein) for all of the Assets in connection with considering the entry of the Bidding Procedures Order; (iii) scheduling one or more auctions (each, an "Auction"), if necessary, and schedule one or more hearings to approve a sale of the Debtors' Assets (a "Sale Hearing"); (iv) approving the form and manner of notice of the proposed Bidding Procedures, the Auction, and the Sale Hearing, substantially in the form attached to the Bidding Procedures Order as Exhibit 2 (the "Auction Notice"); (v) authorizing procedures governing the assumption and assignment of certain executory contracts and unexpired leases (the "Assumed Contracts") in connection with any Sale (the "Assumption and Assignment Procedures"); (vi) approving the form and manner of notice to each relevant non-debtor counterparty to an Assumed Contract (each a "Counterparty"), of (A) the Debtors' calculation of the amount necessary to cure any default under the applicable Assumed Contract (the "Cure Amounts"); and (B) certain other information regarding the potential assumption and assignment of Assumed Contracts in connection with a Sale, substantially in the form attached to the Bidding Procedures Order as Exhibit 3 (the "Assumption and Assignment Notice"); and (vii) granting related relief; and

(b)     one or more orders of the Court (collectively, the "Sale Orders"):[2] (i) authorizing the sale of the Debtors' Assets free and clear of all liens, claims, interests, and encumbrances, except as provided in the Sale Order; (ii) authorizing the assumption and assignment of certain Assumed Contracts in connection with the Sale(s); and (iii) granting related relief; or

(c)     in the event that Ligand is not designated as the Stalking Horse Bidder, a Sale Order, in the form attached hereto as Exhibit B (the "Private Sale Order") (i) authorizing the sale to Ligand of the Debtors' Assets free and clear of all liens, claims, interests, and encumbrances in accordance with the Stalking Horse Agreement (as defined below) attached to the Private Sale Order as Exhibit 1; (ii) authorizing the assumption and assignment of certain Assumed Contracts in connection with the Sale; and (iii) granting related relief.

In support of this Motion, the Debtors rely on and incorporate by reference *Declaration of Paula Brown Stafford in Support of Chapter 11 Petitions and First Day Motions* (the "First

---

[2]     A copy of the proposed form of Sale Order(s) will be filed in advance of the Sale Hearing.

Day Declaration"),[3] filed on the Petition Date.  In further support of this Motion, the Debtors

state as follows:

## PRELIMINARY STATEMENT

1.      Novan is a medical dermatology company primarily focused on researching,

developing and commercializing innovative therapeutic products for skin diseases in the United

States market.  Founded in 2006, Novan is a publicly traded company with its shares listed on

the Nasdaq Stock Market (ticker symbol: NOVN).  Novan is a corporation organized under the

laws of the State of Delaware and maintains its headquarters in Durham, North Carolina.

2.      As detailed in the First Day Declaration, the Debtors have incurred losses each

year since their inception in 2006.  Despite the revenues generated from the commercial sales

and management's best efforts to stabilize operations, the Debtors' business prospects have

significantly declined in recent months.  With their operating cash running low, the Debtors

retained the following advisors to assist the Debtors pursue various strategic alternatives:

Morris, Nichols, Arsht & Tunnell LLP ("Morris Nichols"), as restructuring counsel; Raymond

James Financial, Inc. ("Raymond James"), as investment banker; and SierraConstellation

Partners ("SCP"), as financial advisor; all in connection with the Debtors' restructuring efforts.

3.      Prior to filing these Chapter 11 Cases, the Debtors entered into a new secured

prepetition bridge financing (the "Bridge Financing") and senior secured superpriority debtor-in-

possession term loan (the "DIP Facility") with the prospective Stalking Horse Bidder to fund

these cases and permit a sale of the Debtors' assets to the highest and best bidder.  In addition,

regardless of the form of any Sale, given the targeted prepetition marketing efforts, the Debtors

submit there is less of a need for a lengthy post-petition sale process.  The Debtors and their

advisors believe the sale process proposed herein will reduce administrative costs and provide at

---

[3]     Capitalized terms used but not defined herein shall have the meaning ascribed to them in the First Day
        Declaration.

least a small recovery to creditors, while not impacting the amount or quality of bids they expect to receive.

4.      Accordingly, by this Motion, the Debtors seek approval of the Bidding Procedures Order, which provides the time required to run a successful chapter 11 sale process with a guaranteed floor for the value of the Debtors' Assets provided by the Stalking Horse Bidder, while affording all interested parties with notice and opportunity to object. However, in the event that the Court does not approve the Bidding Procedures Order or approve Ligand as the Stalking Horse Bidder, the Debtors will request that the Court enter the Private Sale Order selling the Debtors' assets to Ligand without a public auction.

## JURISDICTION AND VENUE

5.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over these Chapter 11 Cases, the Debtors and their estates, and this matter under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

6.      Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order with respect to this Motion if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

7.      Venue of these Chapter 11 Cases in this District is proper under 28 U.S.C. §§ 1408 and 1409.

8.      The statutory bases for the relief requested in this Motion are 105, 363, 365, 503, and 507 of title 11 of the Bankruptcy Code, Rules 2002, 6004, and 6006 of the Bankruptcy Rules, and Local Rule 6004-1.

## BACKGROUND

9.      On the date hereof (the "Petition Date"), the Debtors each filed with the Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

10.      The Debtors are authorized to continue operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee, examiner, or official committee of unsecured creditors has been appointed in these Chapter 11 Cases.

### Pre-Petition Marketing and Sale Process

11.      As described in the First Day Declaration, while the Debtors have been seeking a strategic partner for some time now, Raymond James, upon its retention in early June 2023, led a prepetition marketing process seeking potential financing or strategic buyers.  The Debtors and their professionals have worked over the last four weeks evaluating the Debtors' options and exploring paths to address the difficulties facing the company.  Concurrently with the Debtors' prepetition marketing process, the Debtors and their advisors began seeking financing to bridge the company's cash requirements until it could reach definitive agreements on potential partnership and/or sale transactions and potentially to a further point when the Debtors may have greater clarity from the FDA on the potential to receive approval for SB206 in January 2024.

12.      During this prepetition process leading up to the Petition Date, the Debtors (and more recently, with the assistance of Raymond James) contacted approximately 30 potential strategic buyers in the Debtors' industry.  Of those potential strategic partners, 14 executed non-disclosure agreements.  The Debtors and their advisors explored both in- and out-of-court financing or purchase options with these potential strategic partners.  Raymond James and the Debtors also reached out to approximately 10 potential financing parties that regularly lend in Chapter 11 cases.  Due to the nature of the Debtors' assets, none of the potential parties were

willing to provide post-petition financing.

13.     In the weeks leading up to the Petition Date, the Debtors (with the assistance of their advisors) had determined that an out-of-court sale or restructuring was not practical and pivoted towards preparing for a bankruptcy-facilitated transaction.  During this time, the Debtors engaged in negotiations with five (5) potential strategic partners for the financing of the Debtors and/or purchase of the Debtors' assets in bankruptcy.  By late June/early July, several of the potential strategic partners had dropped out.

14.     For the last two weeks, the Debtors engaged in negotiations with Ligand and a couple of other potential partners concerning a potential Stalking Horse Bid and DIP Facility. On July 14, 2023, the Debtors, in the reasoned exercise of their business judgment, determined that the combined DIP Financing and Stalking Horse Bid submitted by Ligand was the highest and best offer received to date.  The results are the proposed Stalking Horse Bid, the proposed DIP Facility and the Chapter 11 process being presented to the Court in connection with the hearing on first day relief.  The Debtors and their advisors are prepared to launch a broad outreach process after the Petition Date to achieve the milestones set forth in the proposed DIP Facility and proposed bidding procedures.

### Need for an Expedited Sale Process

15.     The Debtors and their advisors remain engaged with several groups of potential purchasers and believe that a sale under Section 363 of the Bankruptcy Code as described herein and in the Bidding Procedures is the best path towards facilitating one or more value-maximizing Sales.  In addition, the terms of the DIP Facility afford the Debtors limited funds and short milestones with which to conduct their sale process.  Regardless, given the length and scope of the prepetition marketing process and the Company's severe liquidity position, the Debtors believe that that maximizing value of the Debtors' estates requires a sale process on a

compressed timeframe.

16.    Therefore, the Debtors believe that an Auction process culminating in one or more Sales, closing on or before September 25, 2023 (or no later than 70 days from the Petition Date), will maximize value and allow the Debtors to comply with their obligations under the proposed DIP Facility.  To meet that deadline, the Debtors will be requesting that the Court consider entry of the Bidding Procedures Order no later than August 11, 2023.  In this context, the Debtors will propose the following key dates and deadlines for the Sale process, certain of which dates and deadlines may be subject to extension in accordance with the Bidding Procedures:[4]

| DATE | DEADLINE/EVENT |
|---|---|
| Three (3) business days after the filing of this Motion | Deadline to serve the Initial Assumption and Assignment Notice |
| Three (3) business days prior to the Bidding Procedures Hearing | Deadline to file Initial Contract Objections and Objections to the Private Sale Order |
| On or before August 11, 2023 (No later than 25 days after the Petition Date) | Bidding Procedures Hearing |
| Three (3) business days after entry of the Bidding Procedures Order | Deadline to serve Notice of Auction |
| On or before August 28, 2023 (no later than 42 days after the Petition Date) | Deadline for the submission of Qualified Bids (i.e., the Bid Deadline) |
| August 28, 2023, at 4:00 p.m. (ET) | Deadline to file Initial Sale Objections |
| One (1) business day prior to the Auction | Deadline for Debtors to designate Qualified Bid(s) and Baseline Bid(s) |
| August 31, 2023 (no later than 45 days after the Petition Date) | Auction |

---

[4]  The Debtors reserve the right to modify, in consultation with the Notice Parties, the proposed sale-related dates and deadlines.

| | |
|---|---|
| As soon as practicable and not later than one (1) business day after cancellation or completion of the Auction | Deadline to file and serve Notice of Winning Bid(s) |
| One (1) business day after selection of Winning Bid | Deadline to file and serve an Additional Assumption and Assignment Notice (if applicable) |
| Two (2) business days prior to the Sale Hearing | Deadline to file Winning Bid Objection or Additional Contract Objections |
| One (1) business day prior to the Sale Hearing | Deadline to file reply to any Initial Sale Objection or Winning Bid Objection |
| September 8, 2023 (No later than 55 days after the Petition Date) | Sale Hearing and Entry of Sale Order |
| On or before September 25, 2023 (no later than 70 days after the Petition Date) | Deadline for Winning Bidder(s) to close the transaction contemplated by its Winning Bid |

## **Bidding Procedures**

### 1.    **Overview**

17.    The Bidding Procedures are designed to promote a competitive, fair, and efficient Sale process that will maximize the value of the Debtors' estates.  The Bidding Procedures will allow the Debtors to solicit and identify bids from potential buyers that constitute the highest or otherwise best offer for the Assets, whether as a going concern or as part of a liquidation sale, on a schedule consistent with the Debtors' chapter 11 objectives.

18.    As the Bidding Procedures are attached to the Bidding Procedures Order, they are not restated in their entirety herein.  Pursuant to Local Rule 6004-1, certain of the key terms of the Bidding Procedures are highlighted in the chart below.[5]

---

[5]    To the extent that there is any inconsistency between the terms of the Bidding Procedures and the summary of such terms in this Motion, the terms of the Bidding Procedures shall control. Capitalized terms used but not otherwise defined in this summary shall have the meanings ascribed to such terms in the Bidding Procedures.

| MATERIAL TERMS OF THE BIDDING PROCEDURES AND ORDER | |
|---|---|
| **Qualification of Bidders** Local Rule 6004-1(c)(i)(A) | <u>*Section 2 of the Bidding Procedures*</u>: To become a Qualified Bidder, an Interested Party must submit to the Debtors and their advisors: |
| | (a)  a written disclosure of each entity that will be bidding or otherwise participating in connection with such bid (including each equity holder or other financial backer of the Interested Party, including if such Interested Party is an entity formed for the purpose of consummating the proposed transactions to be set forth in a Proposed APA (as defined below) contemplated by such Interested Party), and the complete terms of any such participation.  Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Qualified Bid.  Each Interested Party must also include the contact information for the specific person(s) and counsel whom the Debtors or their advisors should contact regarding such Qualified Bid; |
| | (b)  a statement and other factual support demonstrating to the Debtors' satisfaction, in consultation with the Notice Parties, in the exercise of their reasonable business judgment that the Interested Party has a bona fide interest in purchasing some or all of the Assets; |
| | (c)  preliminary proof by the Interested Party of its financial capacity to close the Interested Party's proposed transaction(s) to be set forth in a Proposed APA, which may include financial statements of, or verified financial commitments obtained by, the Interested Party (or, if the Interested Party is an entity formed for the purpose of acquiring the desired Assets, the party that will bear liability for a breach), the adequacy of which will be assessed by the Debtors in consultation with their advisors and the Notice Parties; and |
| | (d)  an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Debtors to an Interested Party) in form and substance satisfactory to the Debtors (without limiting the foregoing, each confidentiality agreement executed by an Interested Party shall contain standard non-solicitation provisions) (each, a "<u>Confidentiality Agreement</u>"). |
| | For the avoidance of doubt Ligand, as the Stalking Horse Bidder, shall be deemed a Qualified Bidder for all purposes. |
| **Qualified Bids** Local Rule 6004-1(c)(i)(B) | <u>*Section 7 of the Bidding Procedures*</u>: Other than in the case of a Stalking Horse Bid, which shall be considered a Qualified Bid, to be deemed a "<u>Qualified Bid</u>," a bid must be received from a Qualified Bidder on or the Bid Deadline and satisfy each of the following Bid Requirements: |

| MATERIAL TERMS OF THE BIDDING PROCEDURES AND ORDER |
| --- |

(a) be in writing and received by the Notice Parties prior to the Bid Deadline;

(b) fully discloses the identity of the Qualified Bidder (and to the extent that the Qualified Bidder is a newly formed acquisition entity or the like, the identity of the Qualified Bidder's parent company or sponsor), and provide the contact information of the specific person(s) whom the Debtors or their advisors should contact in the event that the Debtors have any questions or wish to discuss the bid submitted by the Qualified Bidder;

(c) states that the applicable Qualified Bidder offers to (a) purchase, in cash, all of the Assets upon the same terms and conditions, and pursuant to the same form and substance of the Stalking Horse APA modified only by scope of purchased assets, purchase price, and identity of the purchaser, that the Debtors, in consultation with the Notice Parties, reasonably determine are higher than those set forth in the Stalking Horse APA (which determination with respect to the Commercial Assets and the R&D Assets may be made by considering bids submitted by more than one Qualified Bidder in combination); and (b) take assignment of all Assumed Contracts under Stalking Horse APA with details of the Qualified Bidder's proposal for the treatment of related Cure Amounts and the provision of adequate assurance of future performance to the counterparties to such Assumed Contracts; provided, however, that if the Stalking Horse Bidder withdraws from the bidding process, any bid made subsequent to such withdrawal will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder and if the Debtors determine, in consultation with the Notice Parties, such bid complies with these Bidding Procedures as applicable; provided further, however, that under no circumstances may any bid of any bidder other than the Stalking Horse Bid be deemed a Qualified Bid if it does not provide for the unaltered assumption and assignment (the "Royalty Assumption") to the bidder of that certain Development Funding and Royalties Agreement, dated as of May 4, 2019 (as amended from time to time), to which the Stalking Horse Bidder and Novan, Inc. are each a party (the "Royalty Agreement");

(d) includes a signed writing stating that the Qualified Bidder's offer is irrevocable until the selection of the Winning Bidder; provided, however, that if such bidder is selected as the Winning Bidder or the Back-Up Bidder, its offer shall remain irrevocable until the closing of the Sale to the Winning Bidder or the Back-Up Bidder;

(e) does not contain any contingencies of any kind including,

| **MATERIAL TERMS OF THE BIDDING PROCEDURES AND ORDER** | |
| --- | --- |
| | without limitation, contingencies related to financial, due diligence, or internal or shareholder approvals in connection with the submission of a Qualified Bid, and there is no condition precedent to the Qualified Bidder's ability to enter into a definitive Sale agreement; |
| | (f)    provides the date by which the Qualified Bidder intends to close the Sale; provided, however, that the proposed closing date is on or before September 25, 2023; |
| | (g)    contains no due diligence or financing contingencies of any kind; |
| | (h)    includes a duly authorized and executed copy of an asset purchase agreement, which includes the purchase price for the Assets, as allocated for each asset category and in the aggregate, expressed in U.S. Dollars that are greater the $15 million Purchase Price in the Stalking Hose APA, plus the Stalking Horse Protections plus the Minimum Continuing Bid of $100,000, together with all exhibits and schedules thereto, together with a blackline copy to show any modifications to the Stalking Horse APA (a "Proposed APA"); |
| | (i)    includes a proposed sale order (each, a "Proposed Sale Order") based on the Debtors' proposed sale order, and a Qualified Bid must also include a blackline copy of the Proposed Sale Order to show any proposed modifications to the Debtors' proposed sale order; |
| | (j)    specifies the liabilities proposed to be paid or assumed by such Qualified Bid; |
| | (k)    includes financial statements or other written evidence, including (if applicable) a firm, irrevocable commitment for financing, establishing the ability of the Qualified Bidder to consummate the proposed Sale and pay the purchase price in cash, such as will allow the Debtors, in consultation with the Notice Parties, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Proposed APA; |
| | (l)    states or otherwise estimates the types of transition services, if any, the Qualified Bidder would require of and/or provide to the Debtors, including an estimate of the time any such transition services would be required of and/or provided to the Debtors, if the Qualified Bidder's bid were selected as the Winning Bid for the applicable Assets; |

| **MATERIAL TERMS OF THE BIDDING PROCEDURES AND ORDER** |
| --- |

(m) includes an acknowledgement and representation that the bidder: (a) has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer; (b) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; (c) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith or with the Auction, except as expressly stated in the Proposed APA; and (d) is not entitled to any expense reimbursement, break-up fee, or similar type of bid-protections or payments in connection with its bid;

(n) includes evidence, in form and substance reasonably satisfactory to the Debtors and the Notice Parties, of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Proposed APA;

(o) is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Debtors), or such other form acceptable to the Debtors, payable to the order of the Debtors (or such other party as the Debtors may determine) in an amount equal to 10% of the cash portion of the purchase price provided for in the bid (a "Deposit");

(p) acknowledges in writing (a) that it has not engaged in any collusion with respect to any Qualified Bid, specifying that it did not agree with any other party, including, but not limited to, any other Interested Parties or interested third parties, to control price or exert undue influence over the process; and (b) agree not to engage in any such collusion or undue influence with respect to any Qualified Bids, the Auction, or the Sale process;

(q) states that the Qualified Bidder consents to the jurisdiction of the Bankruptcy Court;

(r) contains such financial and other information to allow the Debtors to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to close the transactions contemplated by the Proposed APA, including, without limitation, such financial and other information supporting the Qualified Bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code, including the Qualified Bidder's financial wherewithal and willingness to perform

| MATERIAL TERMS OF THE BIDDING PROCEDURES AND ORDER |
|---|

under any Assumed Contracts ("Adequate Assurance Information"). By submitting a Bid, the Qualified Bidders agree that the Debtors may disseminate their Adequate Assurance Information to any official committee of unsecured creditors appointed in the Chapter 11 Cases (the "Creditors' Committee") and, upon request, to Counterparties;

(s)    contains such other information as may be reasonably requested by the Debtors, in consultation with the Notice Parties;

(t)    sets forth (i) a statement or evidence that the Qualified Bidder has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if applicable, and pay the fees associated with such filings, and (ii) any regulatory and third-party approvals required for the Qualified Bidder to close the transactions contemplated by the Proposed APA, and the time period within which the Qualified Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than five (5) days following execution and delivery of such Qualified Bidder's Proposed APA, those actions the bidder will take to ensure receipt of such approval(s) as promptly as possible); provided that a Qualified Bidder agrees that its legal counsel will coordinate in good faith with the Debtors' legal counsel to discuss and explain Qualified Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable, and in no event later than the time period contemplated in the Proposed APA; provided, further that the offer contains a covenant to cooperate with the Debtors to provide pertinent factual information regarding the bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements;

(u)    provides for the Qualified Bidder to serve as the Back-Up Bidder (as defined below) if the Qualified Bidder's bid is the Back-Up Bid (as defined below), in accordance with the terms of the Proposed APA as submitted or modified at the Auction; and

(v)    provides that in the event of the Qualified Bidder's breach of, or failure to perform under, the Proposed APA, the Qualified Bidder shall forfeit its Deposit to the Debtors, and the Debtors shall be entitled to pursue all available legal and equitable remedies, including, without limitation, additional damages and/or specific performance.

A bid from a Qualified Bidder satisfying all of the above

| **MATERIAL TERMS OF THE BIDDING PROCEDURES AND ORDER** | |
|---|---|
| | requirements, as determined by the Debtors, in consultation with the Notice Parties, shall constitute a Qualified Bid.  The Debtors reserve the right to work with any Qualified Bidder in advance of the Auction to cure any deficiencies in a bid that is not initially deemed a Qualified Bid.  The Debtors, in consultation with the Notice Parties, may determine that separate bids for less than all of the Assets constitute a single Qualified Bid for all, substantially all, or any portion of the Assets; provided that such bids must satisfy the Bid Requirements.  Each Qualified Bidder submitting a bid shall be deemed to: (a) acknowledge and represent that it is bound by all of the terms and conditions of the Bidding Procedures; and (b) have waived the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its bid, the Bidding Procedures, and the Sale. |
| **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder** Local Rule 6004-1(c)(i)(C) | _Section 3 of the Bidding Procedures_: The Stalking Horse Bidder will be entitled to a break-up fee of 3% of its $15 million Purchase Price (the "Break Up Fee" or the "Stalking Horse Protections").  The Stalking Horse Bidder shall be considered a Qualified Bidder, and a Stalking Horse Bid shall be considered a Qualified Bid without regard to any of the requirements or conditions set forth in the Bidding Procedures and without any other or further action by the Stalking Horse Bidder.<br><br>No other bidder or any other party shall be entitled to any termination or "break-up" fee, expense reimbursement, or any other bid protections in connection with the submission of a bid for any Assets, or for otherwise participating in the Auction or the sale process. |
| **Modification of Bidding and Auction Procedures** Local Rule 6004-1(c)(i)(D) | _Section 17 of the Bidding Procedures_: Without prejudice to the rights of the DIP Lender under the DIP Facility or the rights of the Stalking Horse Bidder under the Stalking Horse APA, and except as otherwise provided in these Bidding Procedures, the Bidding Procedures Order or the Debtors' proposed form of Sale Order, the Debtors further reserve the right as they may reasonably determine to be in the best interest of their estates (in consultation with the Notice Parties), to: (a) determine which bidders are Qualified Bidders; (b) determine which bids are Qualified Bids; (c) determine which Qualified Bid is the highest and best proposal and which is the next highest and best proposal; (d) reject any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of these Bidding Procedures or the requirements of the Bankruptcy Code or (iii) contrary to the best interests of the Debtors and their estates; (e) impose additional terms and conditions with respect to all potential bidders other than the Stalking Horse Bidder; (f) modify these Bidding Procedures and/or implement additional |

| MATERIAL TERMS OF THE BIDDING PROCEDURES AND ORDER | |
|---|---|
| | procedural rules that the Debtors determine will better promote the goals of the bidding process; (f) extend the deadlines set forth herein; and (g) continue or cancel the Auction and/or Sale Hearing in open court without further notice or by filing a notice on the docket.  Before extending any deadline, the Debtor shall consult with the Notice Parties and the DIP Lender. |
| **Closing with Alternative Back-Up Bidders** Local Rule 6004-1(c)(i)(E) | _Section 14 of the Bidding Procedures_: In the event that a Winning Bidder fails to close a Sale on or before [•], 2023, or such date as may be extended by the Debtors in consultation with the Notice Parties, and a Back-Up Bidder has been previously identified, the Debtors shall file a Back-Up Bid Auction Notice and serve such notice on the U.S. Trustee, the Notice Parties, and those parties who filed a request to receive notice under Bankruptcy Rule 2002.  Three (3) business days following the filing of any Back-Up Bid Auction Notice, the Back-Up Bid subject to such Back-Up Bid Auction Notice will be deemed to be the Winning Bid, the Back-Up Bidder will be deemed to be the Winning Bidder, and the Debtors shall be authorized, but not directed, to close the Sale to the Back-Up Bidder subject to the terms of the Back-Up Bid without the need for further order of the Court and without the need for further notice to any other parties. |
| **Selection of the Winning Bidder** | _Section 12(o) of the Bidding Procedures_: <br><br> a "Winning Bid" shall: (i) if the Auction for the Assets is cancelled because only the Stalking Horse Bid is submitted on or before the Bid Deadline, be the Stalking Horse Bid; or (ii) if the Auction is conducted, be the Qualified Bid that the Debtors determine at the conclusion of the Auction, in consultation with the Notice Parties, and subject to Court approval, is or are the offer or offers for the relevant Assets that is or are the highest or otherwise best from among the Qualified Bids submitted at the Auction; provided, however, that if the Stalking Horse Bidder withdraws from the bidding process, the Debtors' selection of the Winning Bid(s) for the Assets from among the other Qualified Bidders at the conclusion of the Auction shall each require the consent of Ligand.  In the case of (ii), in making this decision, the Debtors shall consider, in consultation with the Notice Parties (and with the consent of Ligand if the Stalking Horse Bidder withdraws from the bidding process), the amount of the purchase price, the assumption of liabilities, the transaction structure, and execution risk, including, without limitation, the likelihood of the bidder's ability to close a transaction and the timing thereof, the number, type, and nature of any changes to the Stalking Horse APA submitted with the Winning Bid, as applicable, requested by each bidder, the total consideration to the Debtors' estates, and any other factors the Debtors may deem |

| MATERIAL TERMS OF THE BIDDING PROCEDURES AND ORDER | |
|---|---|
| | relevant.  The bidder submitting the Winning Bid shall become the "<u>Winning Bidder</u>," and shall have such rights and responsibilities of the purchaser as set forth in such Winning Bid, with all modifications made at the Auction.  The Debtors may, in their business judgment and in consultation with the Notice Parties, designate the Back-Up Bid (and the corresponding Back-Up Bidder) to purchase the applicable Assets in the event that the applicable Winning Bidder does not close the Sale; <u>provided</u>, <u>however</u>, that if the Stalking Horse Bidder withdraws from the bidding process, the Debtors' selection of the Back-Up Bidder from the other Qualified Bidders at the conclusion of the Auction shall require the consent of Ligand. |

## 2.    Noticing and Objection Procedures

19.    The chart below sets forth the proposed noticing and objection procedures and requirements established by the Bidding Procedures (collectively, the "<u>Sale Noticing and Objection Procedures</u>"):

| SALE NOTICING AND OBJECTION PROCEDURES | |
|---|---|
| **Auction Notice** | Within three (3) business days after the entry of the Bidding Procedures Order, the Debtors shall serve the Auction Notice, substantially in the form attached to the Bidding Procedures Order, on: (a) the U.S. Trustee; (b) counsel to the Stalking Horse Bidder; (c) counsel to any Creditors' Committee; (d) all parties known by the Debtors to assert a lien or encumbrance on any of the Assets; (e) all persons known or reasonably believed to have asserted an interest in or claim to any of the Assets; (f) all persons known or reasonably believed to have expressed an interest in acquiring all or a substantial portion of the Assets within the one (1) year prior to the Petition Date; (g) the Office of the United States Attorney for the District of Delaware; (h) the Office of the Attorney General in each state in which the Debtors have operated; (i) the Office of the Secretary of State in each state in which the Debtors have operated; (j) the Internal Revenue Service and all state and local taxing authorities in the states in which the Debtors have or may have any tax liability; (k) the Securities and Exchange Commission; (l) the Federal Trade Commission; (m) all of the Debtors' other known creditors and equity security holders; and (n) all other parties that have filed a notice of appearance and demand for service of papers in the Chapter 11 Cases as of the service date.  The Debtors shall post the Auction Notice and the Bidding Procedures Order on the website of the Debtors' claims and |

| | noticing agent. |
|---|---|
| | No later than seven (7) calendar days of the entry of the Bidding Procedures Order, the Debtors shall cause the Auction Notice to be published once in the national edition of USA Today or another nationally circulated newspaper. |
| **Initial Sale Objections** | All objections to the sale of the Assets, including any objection to the sale of any Assets free and clear of liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code to the Stalking Hose Bidder, a Successful Bidder and/or a Backup Bidder (each, an "Initial Sale Objection"), shall be filed by no later than **August 28, 2023, at 4:00 p.m. (ET)**; ***provided*, *however, that if the Debtors are required to seek approval of the Stalking Horse APA via the Private Sale Order, objections to the entry of that order shall be due prior to the Bidding Procedures Hearing*.** |
| **Notice of Qualified Bid(s) and Baseline Bid(s)** | No later than one (1) business day prior to the Action, the Debtors shall: (a) notify all Qualified Bidders whether their bids have been determined to be a Qualified Bid; and (b) determine, in consultation with the Notice Parties, which of the Qualified Bids are Baseline Bids, and shall promptly notify all Qualified Bidders with Qualified Bids of the Baseline Bid. |
| **Auction Results** | On or before one (1) business day after the selection of any Winning Bid(s), the Debtors shall file a notice with the Court that sets forth: (i) the identity of the Winning Bidder(s) and any Back-Up Bidder; (ii) the amount of the Winning Bid and any Back-Up Bid; (iii) a summary of the Assets subject to the Winning Bid; and (iv) whether the Winning Bidder or the Back-Up Bidder have any connections to the Debtors other than those arising from their respective bids |
| **Winning Sale Objections** | Any objection solely with respect to the conduct of the Auction, the Auction results, the selection of the Winning Bid and/or Back-Up Bid, or the terms of any Sale to the Winning Bidder or the Back-Up Bidder shall be filed no later than **two (2) business days prior to the Sale Hearing**. |
| | The Debtors and any other entity shall have until one (1) business day prior to the Sale Hearing, at 12:00 p.m. (ET), to file and serve a reply to any Initial Sale Objection or Winning Bid Objection. |

20.     The Debtors submit that the Sale Noticing and Objection Procedures, coupled with the Bidding Procedures and Assumption and Assignment Procedures described below, constitute adequate and reasonable notice of the key dates and deadlines and other important information regarding the Sale process, including the objection deadlines, the Bid Deadline, and

the time and location of the Auction and Sale Hearing.  Accordingly, the Debtors request that the

Court approve the form of Auction Notice, substantially in the form attached to the Bidding

Procedures Order as <u>Exhibit 2</u>, and find that the Sale Noticing and Objection Procedures comply

with the requirements of Bankruptcy Rule 2002 and Local Rule 2002-1.

> **3.    Assumption and Assignment Procedures**

21.    In connection with a Sale transaction, the Debtors may seek to assume and assign

to a Winning Bidder (including the Stalking Horse, if it is the Winning Bidder) one or more

Assumed Contracts.  The Assumption and Assignment Procedures are designed to, among other

things, govern the Debtors' provision of Adequate Assurance Information and notice of Cure

Amounts to applicable Counterparties.  The chart below sets forth the Assumption and

Assignment Procedures:

| ASSUMPTION AND ASSIGNMENT PROCEDURES | |
|---|---|
| **Initial Assumption and Assignment Notice** | On or before three (3) business days after the Petition Date, the Debtors shall serve the Initial Assumption and Assignment Notice, substantially in the form attached to the Bidding Procedures Order, via overnight delivery, on any Counterparty to the Debtors' universe of executory contracts and unexpired commercial real property leases.  This notice shall include: (a) notice that such Counterparty's contract may be designated an Assumed Contract as part of the relevant Stalking Horse Bid; (b) the Cure Amount if any, that the Debtors believe is required to be paid to the Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code for such Assumed Contract; and (c) the Adequate Assurance Information of the Stalking Horse Bidder.<br><br>The inclusion of any executory contract or unexpired commercial real property lease on the Initial Assumption and Assignment Notice shall not constitute an admission that a particular contract is an executory contract or unexpired lease or require or guarantee that such contract will be an Assumed Contract. |
| **Additional Assumption and Assignment Notice** | On or before one (1) business day after the selection of a Winning Bid or a Back-Up Bid, the Debtors shall serve the Additional Assumption and Assignment Notice, substantially in the form attached to the Bidding Procedures Order, via overnight delivery, on any Counterparty to the Debtors' executory contracts and unexpired |

| | |
|---|---|
| | commercial real property leases that the relevant Winning Bidder or Back-Up Bidder desires to assume as part of its Winning Bid *that was not already listed on the Initial Assumption and Assignment Notice*.  This additional notice shall include: (a) notice that such Counterparty's contract is an Assumed Contract as part of the relevant Winning Bid; (b) the Cure Amount if any, that the Debtors believe is required to be paid to the Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code for such Assumed Contract; and (c) the Adequate Assurance Information of the relevant Winning Bidder and Back-Up Bidder. <br><br> The inclusion of any executory contract or unexpired commercial real property lease on the Additional Assumption and Assignment Notice shall not constitute an admission that a particular contract is an executory contract or unexpired lease or require or guarantee that such contract will be an Assumed Contract. |
| **Contract Objections** | If a Counterparty objects to (a) the proposed assumption and assignment of its Assumed Contract set forth in the Initial Assumption and Assignment Notice (including, without limitation, on the basis (i) that the Stalking Horse Bidder cannot provide adequate assurance of future performance; (ii) of the transfer of any related rights or benefits thereunder; or (iii) that Counterparty consent is allegedly required for the assumption, assignment, and transfer of the Assumed Contract), or (b) the Cure Amount set forth in the Initial Assumption and Assignment Notice, the Counterparty must file a Contract Objection **on or before three (3) business days prior to the Bidding Procedures Hearing**. <br><br> If a Counterparty objects to (a) the proposed assumption and assignment of its Assumed Contract set forth in the Additional Assumption and Assignment Notice (including, without limitation, on the basis (i) that the Stalking Horse Bidder cannot provide adequate assurance of future performance; (ii) of the transfer of any related rights or benefits thereunder; or (iii) that Counterparty consent is allegedly required for the assumption, assignment, and transfer of the Assumed Contract), or (b) the Cure Amount set forth in the Additional Assumption and Assignment Notice, the Counterparty must file a Contract Objection **on or before two (2) business days prior to the Sale Hearing**. |

| Resolution of Contract Objections | The Debtors, the Stalking Horse Bidder or relevant Winning Bidder, and the objecting Counterparty shall first confer in a good faith attempt to resolve the Contract Objection without Court intervention. If the parties are unable to consensually resolve the Contract Objection, the Debtors may request an emergency hearing for the Court to resolve the Contract Objection.<br><br>A Contract Objection may be resolved after the closing date of the applicable Sale, subject to the terms of the asset purchase agreement approved in connection with the Sale. |
|---|---|
| Failure to Timely Object | If no Contract Objection is timely received with respect to an Assumed Contract: (a) the Counterparty to such Assumed Contract shall be deemed to have consented to the assumption by the Debtors and assignment or transfer (including the transfer of any related rights and benefits thereunder) to the Stalking Horse Bidder or Winning Bidder, as applicable, of the Assumed Contract, and be forever barred and estopped from asserting or claiming against the Debtors or the Stalking Horse Bidder or the Winning Bidder, as applicable, that any additional defaults exist or that conditions to assumption, assignment, and transfer must be satisfied under the Assumed Contract (including, without limitation, with respect to adequate assurance of future performance by the Stalking Horse Bidder or Winning Bidder, as applicable), or that any related right or benefit under such Contract cannot and will not be available to the Stalking Horse Bidder or the Winning Bidder, as applicable;  (b) any and all defaults under the Assumed Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code upon payment of the applicable Cure Amount; and (c) the Cure Amount for such Assumed Contract shall be controlling, notwithstanding anything to the contrary in such Assumed Contract, or any other related document, and the Counterparty shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims related to such Assumed Contract against the Debtors and their estates or the Stalking Horse Bidder or Winning Bidder, as applicable, or the property of any of them, that existed prior to the entry of the Sale Order. |
| Reservation of Rights | In the event a Contract Objection is resolved in a manner unfavorably, then the Debtors may withdraw (or the Stalking Horse Bidder or the Winning Bidder, as applicable, may cause the Debtors to withdraw), their request to assume and assign such Assumed Contract as part of any bid. |

**The Stalking Horse APA**

| MATERIAL TERMS OF THE PROPOSED ASSET PURCHASE AGREEMENT | |
|---|---|
| **The Form APA is the Stalking Horse APA** | *Section 2 of the Bidding Procedures*:<br>The asset purchase agreement by and between the Debtors and Ligand (the "Stalking Horse APA"), attached to Exhibit B hereto as Exhibit 1, which includes, among other things, a description of the Assets, customary representations, warranties, and covenants by and from the Debtors and Ligand. A copy of the Stalking Horse APA will be posted in the Data Room, and may also be obtained by Interested Parties upon request to the Debtors' advisors. |
| **Releases**<br>Local Rule 6004-1(b)(iv)(C) | *Section 5.8 of the Stalking Horse APA*:<br>The Stalking Horse APA includes a full release of Ligand by the Debtors. |
| **Private Sale/No Competitive Bidding**<br>Local Rule 6004-1(b)(iv)(D) | *Section 5.2 of the Stalking Horse APA*:<br>The Stalking Horse APA requires the Debtors to sell the Debtors' Assets to Ligand by a private sale without bidding or an auction if the Court does not enter the (i) Bidding Procedures Order on or before 25 calendar days after the Petition Date, or (ii) DIP Order on or before 25 calendar days after the Petition Date. |
| **Closing Date**<br>Local Rule 6004-1(b)(iv)(E) | *Article 1 of the Stalking Horse APA*:<br>The Stalking Horse APA provides for an "Outside Date" no later than seventy (70) days after the Petition Date. |
| **Record Retention**<br>Local Rule 6004-1(b)(iv)(J) | *Section 6.3 of the Stalking Horse APA*:<br>The Stalking Horse APA provides the Debtors with access to all sold Records until the latest of (i) three years after the Closing Date, (ii) the required retention period for all government contact information, records or documents, (iii) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases or (iv) in the case of Records related to Taxes, the expiration of the statute of limitation applicable to such Taxes. |
| **Sale of Avoidance Actions**<br>Local Rule 6004-1(b)(iv)(K) | *Section 2.1(l) of the Stalking Horse APA*:<br>The Stalking Horse APA provides for the sale of all causes of action, lawsuits, claims, rights of recovery and other similar rights of any Seller, including avoidance claims or causes of action under Chapter 5 of the Bankruptcy Code relating to the business of the Sellers or the Purchased Assets. |
| **Requested Findings as to Successor Liability**<br>Local Rule 6004- | *Section 6.8 of the Stalking Horse APA*:<br>The Stalking Horse APA provides that the Parties intend that, to the fullest extent permitted by applicable Law (including under Section 363 of the Bankruptcy Code), upon the closing, Buyer shall not be |

| MATERIAL TERMS OF THE PROPOSED ASSET PURCHASE AGREEMENT | |
|---|---|
| 1(b)(iv)(L) | deemed to: (a) be the successor of any Seller, (b) have, de facto or otherwise, merged with or into any Seller, (c) be a mere continuation or substantial continuation of any Seller or the enterprise(s) of Sellers or (d) be liable or have any Liability for any acts or omissions of Sellers in the conduct of their businesses or arising under or related to the Purchased Assets other than as expressly set forth and agreed in this Agreement. |
| **Credit Bidding** Local Rule 6004-1(b)(iv)(N) | _Section 4 of the Bidding Procedures:_ Ligand shall be entitled to pay the Purchase Price under the Stalking Horse APA, and fund Overbids during the Auction if there is competitive bidding, with (i) an offset, on a dollar-for-dollar basis, against the Debtors' Obligations (as defined in the DIP Facility) under the DIP Facility; and/or (ii) cash. |
| **Relief from Bankruptcy Rule 6004(h)** Local Rule 6004-1(b)(iv)(O) | As set forth below, the Debtors believe that the Sale should be consummated as soon as practicable to preserve and maximize value for creditors. |

### Private Sale (in the Alternative)

22.     As noted above, pursuant to the DIP Facility and Section 5.2(i) in the Stalking Horse APA, in the event the Bankruptcy Court does not enter the (i) Bidding Procedures Order on or before 25 calendar days after the Petition Date; or (ii) DIP Order (as defined in the Stalking Horse APA) on or before 25 calendar daters after the Petition Date (either such event, a "Conversion Trigger Event"), then the Debtors are required to sell the Debtors' Assets to Ligand free and clear of all liens, claims, interests, and encumbrances by private sale in accordance with the Private Sale Order attached hereto as Exhibit B.   More specifically, in accordance with the Bidding Procedures Order, upon a Conversion Trigger Event the Parties shall use their respective reasonable best efforts to obtain an order of the Bankruptcy Court to enter an order approving the Stalking Horse APA as a "private sale" no longer subject to overbids.

23.     To enable the Debtors to timely pivot to a private sale if necessary, the Debtors are setting three (3) business days prior to the Bidding Procedures Hearing as the deadline to

object to the entry of the Private Sale Order.

## **RELIEF REQUESTED**

24.    By this Motion, pursuant to sections 105(a), 363, 365, 503, and 507 of the

Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Local Rule 6004-1, the Debtors

request entry of the following:

A.    the Bidding Procedures Order, substantially in the form attached hereto as Exhibit A, granting the following relief:

1.    approving the Bidding Procedures, substantially in the form attached to the Bidding Procedures Order as Exhibit 1, to be used in connection with one or more Sales of the Debtors' Assets;

2.    authorizing the Debtors to designate Ligand as the Stalking Horse Bidder;

3.    scheduling (A) one or more Auctions for the Assets; and (B) one or more Sale Hearings to consider approval of a proposed Sale(s), subject to the availability of the Court;

4.    approving the Auction Notice, substantially in the form attached to the Bidding Procedures Order as Exhibit 2;

5.    approving the Assumption and Assignment Procedures;

6.    approving the Assumption and Assignment Notice, to be used for both the Initial Assumption and Assignment Notice and the Additional Assumption and Assignment Notice, substantially in the form attached to the Bidding Procedures Order as Exhibit 3; and

7.    granting related relief; and

B.    one or more Sale Order(s), granting the following relief:

1.    authorizing the Sale or Sales of Assets free and clear of all liens, claims, interests, and encumbrances, except certain permitted encumbrances and assumed liabilities as determined by the Debtors and the Winning Bidder(s), with liens to attach to the proceeds of the applicable Sale;

2.    authorizing the assumption and assignment of Assumed Contracts in connection with a Sale; and

3.    granting related relief; or

C.    in the alternative, the Private Sale Order, granting the following relief:

1.    authorizing the Sale of Assets to Ligand free and clear of all liens, claims, interests, and encumbrances, except certain permitted encumbrances and assumed liabilities as determined by the Debtors and Ligand, with liens to attach to the proceeds of the Sale;

2.    authorizing the assumption and assignment of Assumed Contracts in connection with this Sale; and

3.    granting related relief.

## BASIS FOR RELIEF

1. **The Bidding Procedures Are Fair, Appropriate, and In the Best Interests of the Debtors and Their Stakeholders**

25.    The Bidding Procedures are specifically designed to promote what courts have deemed to be the paramount goal of any proposed sale of property of a debtor's estate: maximizing the value of sale proceeds received by the estate.  *See Burtch v. Ganz (In re Mushroom Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that a debtor "had a fiduciary duty to protect and maximize the estate's assets"); *In re Food Barn Stores, Inc.,* 107 F 3d 558, 564-65 (8th Cir. 1997) (recognizing that main goal of any proposed sale of property of a debtor's estate is to maximize value).  Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing the value of a debtor's estate.  *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (observing that sale procedures "encourage bidding and . . . maximize the value of the debtor's assets").

26.    The Bidding Procedures provide for an orderly, uniform, and appropriately competitive process through which interested parties may submit offers to purchase the Assets. Given the case timeline negotiated with Ligand, and taking into consideration the prepetition

marketing process, the Debtors, with the assistance of their advisors, have structured the Bidding Procedures to promote active bidding by interested parties for the R&D Assets, the Commercial Assets, or all of the Assets, and to confirm the highest or otherwise best officer reasonably available for the Assets.  The Bidding Procedures will allow the Debtors to conduct any Auction in a fair and transparent manner that will encourage participation by financial capable bidders with demonstrated ability to consummate a timely sale or sales.

27.    Accordingly, the Bidding Procedures should be approved because they are aligned with the circumstances of these Chapter 11 Cases and are reasonable, appropriate, and in the best interests of the Debtors, their estates, and all parties in interest.

### 2.    Approval of One or More Sales Is Warranted Under Section 363 of the Bankruptcy Code

28.    Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of a debtor's estate, courts have approved the authorization of a sale of a debtor's assets if such sale is based upon the sound business judgment of the debtor.  *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephen Indus., Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986); *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983).

29.    Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was provided to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the

parties have acted in good faith.  *See In re Decora Indus., Inc.*, No. 00-4459 (JJF), 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)).  Where a debtor demonstrates a valid business justification for a decision, it is presumed that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. at 656.  At any Sale Hearing, the Debtors intend on showing that any sale satisfies the sound business judgment standard.

(i)    **The Debtors Have Demonstrated a Sound Business Justification for the Sale(s) of Assets**

30.    A sound business purpose for the sale of a debtor's assets outside the ordinary course of business exists where such sale is necessary to preserve the value of the estate for the benefit of creditors and interest holders.  *See, e.g., Cumberland Farms Dairy, Inc. v. Abbotts Dairies of Penn., Inc. (In re Abbotts Dairies of Penn., Inc.)*, 788 F.2d 143 (3d Cir. 1986); *Lionel Corp., 722 F.2d at 1063; Food Barn Stores*, 107 F.3d at 564-65 (recognizing the paramount goal of any proposed sale of property of estate is to maximize value).

31.    As set forth above and in the First Day Declaration, a strong business justification exists for the sale of the Assets as described herein.  In light of the Debtors' financial condition, an orderly and expeditious sale or sales of the Assets is critical to maximizing the value of the Debtors' estates and recoveries for the Debtors' economic stakeholders.  Moreover, the proposed Sale process timeline is appropriate it is required under the DIP Facility, without which, the Debtors would not be able to fund the Sale process.  In addition, the compressed timeline is appropriate in light of the nature of the Assets and the targeted prepetition marketing process.

(ii)    **The Sale Noticing and Objection Procedures Are Appropriate and Comply With Bankruptcy Rules 2002 and 6004**

32.    Bankruptcy Rules 2002 and 6004 require the Debtors to notify creditors of a

proposed sale, provide a description of the assets being sold, and disclose the time and place of the Auction, the terms and conditions of any proposed Sale transaction and any objection deadlines. *See* Fed. R. Bankr. P. 2002(a), 2002(c), and 6004(a). The Sale Noticing and Objection Procedures set forth above are reasonably calculated to provide all of the Debtors' known creditors and other parties in interest with adequate and timely notice of all of the key dates, deadlines, and other material information related to the Sale process. Accordingly, the Debtors request that the Court approve the Sale Noticing and Objection Procedures, including the Auction Notice, substantially in the form attached to the Bidding Procedures as <u>Exhibit 2</u>, and find that no other or further notice of the Bidding Procedures, the Auction (excluding the Auction results), or the Sale Hearing is necessary or required.

### (iii) The Proposed Sale Will Yield a Fair and Reasonable Purchase Price for the Assets

33.     The Debtors believe that any Sale transaction governed by the Bidding Procedures will yield a fair and reasonable purchase price for the relevant Assets. Given the targeted prepetition marketing process, the Debtors submit that the Bidding Procedures are well tuned to facilitate a competitive bidding process in light of the Debtors' financial situation.

34.     The Debtors constructed the Bidding Procedures to promote transparency, good faith, and fairness throughout the Sale Process. The Bidding Procedures provide an appropriate framework for the Debtors to review, analyze, and compare bids for the Assets, and to engage with bidders on an arm's-length basis to work to improve the quality of their bids for the benefit of all parties in interest. Any Sale governed by the Bidding Procedures will serve the important objectives of obtaining not only a fair and reasonable purchase price, but also the highest and best value for the Assets.

**(iv)    The Bidding Procedures Ensure that the Sale Process Is Conducted in
Good Faith and that the Winning Bidder(s) Is Entitled to the
Protections Afforded by Section 363(m) of the Bankruptcy Code**

35.    Section 363(m) of the Bankruptcy Code is designed to protect the sale of a

debtor's assets to a good-faith purchaser.  Specifically, section 363(m) provides the following:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property does
> not affect the validity of a sale or lease under such authorization to an
> entity that purchased or leased such property in good faith, whether or
> not such entity knew of the pendency of the appeal, unless such
> authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) embodies "[the] policy of not only affording finality to the

judgment of the bankruptcy court, but particularly to give finality to those orders and judgments

upon which third parties rely." *Abbotts Dairies*, 788 F.2d 143, 147 (3d Cir. 1986)); *see also*

*Reloeb Co. v. LTV Corp. (In re Chateaugay Corp.)*, No. 92 Civ. 7054 (PKL), 1993 U.S. Dist.

LEXIS 6130, at *9 (S.D.N.Y. May 10, 1993); *Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888

(S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be

affected by the reversal or modification on appeal of an unstayed order, whether or not the

transferee knew of the pendency of the appeal.").

36.    While the Bankruptcy Code does not define "good faith," the Third Circuit has held

that "the phrase encompasses one who purchases in 'good faith' and for 'value.'"  *Abbotts*

*Dairies*, 788 F.2d at 147 (to constitute lack of good faith, a party's conduct in connection with the

sale must usually amount to fraud, collusion between the purchaser and other bidders or the trustee

or an attempt to take grossly unfair advantage of other bidders); *see also In re Bedford Springs*

*Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); *In re Perona Bros., Inc.*, 186 B.R. 833,

839 (D.N.J. 1995).

37.    In other words, a party would have to show fraud or collusion between the

Debtors and bidders to demonstrate a lack of good faith.  *See Kabro Assocs. of West Islip, LLC v.*

*Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F .3d 269, 276 (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a [buyer]'s good faith status at a judicial sale involves fraud, collusion between the [buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders"). Due to the absence of a bright-line test for good faith, the determination is based on the facts of each case, with a focus on the "integrity of [a bidder's] conduct in the course of the sale proceedings." *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1998 (7th Cir. 1978)).

38.     As set forth above, the Bidding Procedures are designed to produce a fair and transparent competitive bidding process that will yield the highest or otherwise best value for the Assets. Any asset purchase agreement with a Winning Bidder, including the Stalking Horse APA, executed by the Debtors will be (or was) negotiated at arm's-length and in good faith at each stage of the negotiations.

39.     The Debtors submit that, regarding Ligand as the Stalking Horse Bidder, the Debtors will seek a finding that such Stalking Horse Bidder is a "good faith purchaser" within the meaning of section 363(b) of the Bankruptcy Code. Further, each Auction Bidder must confirm that it has not engaged in any collusion with respect to the Bidding Procedures, the Auction, or any Sale. Any purchase agreement with a Winning Bidder executed by the Debtors will be negotiated at arm's length and in good faith. As such, the Debtors will request a finding that any Winning Bidder is a good-faith purchaser and is entitled to the full protections afforded under section 363(m) of the Bankruptcy Code.

40.     Based on the foregoing, the Debtors submit that they have demonstrated that any proposed Sale is a sound exercise of the Debtors' business judgment and should be approved as a good faith transaction.

**3.      A Sale Free and Clear of Liens, Claims, Interests, and Encumbrances Is Appropriate Under Section 363(f) of the Bankruptcy Code**

41.      In the interest of attracting the best offers, the Court should authorize the Debtors to sell the Assets free and clear of any and all liens, claims, interests, and other encumbrances (other than permitted encumbrances or assumed liabilities in any relevant purchase agreement), in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims, interests, and encumbrances attaching to the proceeds of the applicable Sale.    Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances if any one of the following conditions is satisfied:

a.      applicable non-bankruptcy law permits sale of such property free and clear of such interest;

b.      such entity consents;

c.      such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

d.      such interest is in bona fide dispute; or

e.      such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same).

42.      Section 363(f) of the Bankruptcy Code is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a); *see also Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct

such sales [free and clear of claims] is within the court's equitable powers when necessary to carry out the provisions of [the Bankruptcy Code].").

43.     The Debtors anticipate that any Sale transaction(s) they elect to pursue will satisfy one or more of the requirements under section 363(f) of the Bankruptcy Code to permit a "free and clear" sale of the applicable Assets.  Here, the Assets are subject to the prepetition liens of Ligand, who the Debtors expect will consent to any Sale, but also would likely be adequately protected by such liens attaching to the proceeds of the applicable Sale in the order of their respective priority.  Additionally, any parties with junior liens on the assets can be compelled to accept a money satisfaction of their interests, but also would likely be adequately protected by such liens attaching to the proceeds of the applicable Sale.  Moreover, the Bidding Procedures require the Debtors to send the Auction Notice to all purported lienholders.  If such lienholders do not object to the proposed Sale, then their consent should be presumed.  Accordingly, the Debtors request that, unless a party asserting a prepetition lien, claim, or encumbrance on any of the Assets timely objects, such party shall be deemed to have consented to any Sale approved at the Sale Hearing.  *See Hargave v. Twp. of Pemberton*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to a sale motion, a creditor is deemed to consent to the relief requested therein).

44.     Accordingly, the Debtors request that the Court authorize the sale of the Assets free and clear of any liens, claims, interests, and encumbrances, in accordance with section 363(f) of the Bankruptcy Code, subject to such liens, claims, interests, and encumbrances (other than permitted encumbrances or assumed liabilities in any relevant purchase agreement), to the fullest extent permitted by section 363(f) of the Bankruptcy Code.

### 4.     The Debtors' Assumption and Assignment of Executed Contracts and Unexpired Leases Is Appropriate Under Section 365 of the Bankruptcy Code

45.     To the extent Ligand or a Winning Bidder purchases the Debtors' business as a going concern, the Debtors request relief under section 365 of the Bankruptcy Code.  Section

365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  Courts employ the business judgment standard in determining whether to approve a debtor's decision to assume or reject an executory contract or unexpired lease.  *See, e.g., In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court"); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that a debtor's decision to assume or reject executory contract is governed by business judgment standard and may only be overturned if decision is product of bad faith, whim, or caprice).  The "business judgment" test in this context only requires that a debtor demonstrate that assumption or rejection of an executory contract or unexpired lease benefits the estate. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989).

46.     Assumption of any Assumed Contract is an exercise of the Debtors' sound business judgment because the transfer of such Purchased Contracts in connection with a Sale is necessary to the Debtors' ability to obtain the best value for the Assets.   Given that consummation of the Sale is critical to the Debtors' efforts to maximize value for their estates and stakeholders, the Debtors' assumption of Assumed Contracts is an exercise of sound business judgment and, therefore, should be approved.

47.     The consummation of any Sale involving the assignment of Assumed Contracts will be contingent upon the Debtors' compliance with the applicable requirements of section 365 of the Bankruptcy Code.   Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Assumed Contracts be cured or that the Debtors provide adequate assurance that such defaults will be promptly cured.  *See* 11 U.S.C. § 365(b)(1).  The Debtors' assumption and assignment of Assumed Contracts will be contingent upon payment of the Cure

Amounts and effective only upon the closing of the applicable Sale.  As set forth above, the

Debtors propose to file with the Court and serve on each Counterparty to the Debtors' universe

of executory contracts and unexpired leases an Assumption and Assignment Notice, which will

set forth the Debtors' good faith calculations of Cure Amounts with respect any such contracts or

unexpired leases listed on such Assumption and Assignment Notice, and the procedures by

which such Counterparty may object to the assumption and assignment of its contract or

unexpired lease at the Sale Hearing or at a separate hearing scheduled prior to closing.

48.     Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an

executory contract or unexpired lease if "adequate assurance of future performance by the

assignee of such contract or lease is provided."    11 U.S.C. § 365(f)(2).    The meaning of

"adequate assurance of future performance" depends on the facts and circumstances of each case,

but should be given "practical, pragmatic construction."  *See Carlisle Homes, Inc. v. Azzari (In re*

*Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citation omitted); *see also In re*

*Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future

performance does not mean an absolute assurance that debtor will thrive and pay rent); *In re Bon*

*Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) (finding that,

"[a]lthough no single solution will satisfy every case, the required assurance will fall considerably

short of an absolute guarantee of performance").  Among other things, adequate assurance may be

provided by evidencing the assignee's financial health and experience in managing the type of

enterprise or property assigned.  *See In re  Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y.

1986) (adequate assurance of future performance is present when the prospective assignee of a

lease has financial resources and has expressed willingness to devote sufficient funding to the

business to give it a strong likelihood of succeeding).

49.     The Bidding Procedures expressly specify that any Qualifying Bid that includes

the assumption and assignment of any Assumed Contracts must include with information regarding the bidder's ability to perform any Assumed Contracts that it wishes for the Debtors to assume and assign.  The Assumption and Assignment Procedures require the Debtors to furnish all available Adequate Assurance Information to the relevant Counterparties to provide such Counterparties ample opportunity to review such information and object if they so choose.  To the extent necessary, the Debtors will present facts at the Sale Hearing to show the financial wherewithal, willingness and ability of the Stalking Horse Bidder or Winning Bidder to perform under any Assumed Contracts that it wishes for the Debtors to assume and assign.  In light of the foregoing, the Debtors' assumption and assignment of any Assumed Contracts in accordance with the Assumption and Assignment Procedures would satisfy the requirements of section 365 of the Bankruptcy Code and should be approved.

### 5.    The Stalking Horse Protections Should Be Approved

50.    The Stalking Horse APA provides for the Stalking Horse Protections, consisting of a Break-Up Fee of $450,000 (3% of the proposed purchase price).  Additionally, the Stalking Horse APA requires the Debtors to assume and assign the Royalty Agreement (the "Royalty Assumption") to a purchaser in connection with any Sale of Assets related to the R&D Assets.

51.    The Debtors believe that the Stalking Horse Protections, along with the Royalty Assumption, are an essential prerequisite for the Stalking Horse Bidder to enter into the Stalking Horse APA.  In addition, the Debtors believe that the presence of the Stalking Horse Bidder will set a floor for the value of the Assets and attract other potential buyers to bid for such assets, thereby maximizing the realizable value of the Assets for the benefit of the Debtors' estates, their creditors, and all other parties in interest.

52.    Approval of the Stalking Horse Protections is governed by standards for determining the appropriateness of bid protections in the bankruptcy context.  Courts have

identified at least two instances in which bid protections may benefit the estate.  First, a break-up or expense reimbursement fee may be necessary to preserve the value of a debtor's estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *In re O'Brien Envtl. Energy, Inc*., 181 F.3d at 533.  Second, if the availability of a break-up fee or expense reimbursement was to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth.  *See id.*; *see also In re Reliant Energy Channel View LP*, 594 F.3d 200, 206–08 (3d Cir. 2010) (reasoning that a break-up fee should be approved if it is necessary to entice a party to make the first bid or if it would induce a stalking horse purchaser to remain committed to a purchase).

53.      In *O'Brien*, the Third Circuit reviewed the following nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee or expense reimbursement:

   a.   the presence of self-dealing or manipulation in negotiating the break-up fee;

   b.   whether the fee harms, rather than encourages, bidding;

   c.   the reasonableness of the break-up fee relative to the purchase price;

   d.   whether the unsuccessful bidder placed the estate property in a "sale configuration mode" to attract other bidders to the auction;

   e.   the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders or attract additional bidders;

   f.   the correlation of the fee to a maximum value of the debtor's estate;

   g.   the support of the principal secured creditors and creditors' committees of the break-up fee;

> h.      the benefits of the safeguards to the debtor's estate; and
>
> i.      the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

*See In re O'Brien Envtl. Energy, Inc*., 181 F.3d at 536.

54.      Although none of the factors is dispositive, an application of the facts to several of such factors supports the approval of the Stalking Horse Protections in this case.  In particular, the Stalking Horse Protections are necessary to preserve the value of the Debtors' estates because they will enable the Debtors to secure an adequate floor for the Assets—a clear benefit to the Debtors' estates.

55.      Moreover, there has been no showing of any self-dealing or manipulation of any kind in the negotiation of the Stalking Horse Protections.  Rather, the Stalking Horse Protections are the result of good faith, arm's-length negotiations between the Debtors and Ligand.  The Debtors believe that the agreement to pay the Stalking Horse Protections and along with the Royalty Assumption requirement is reasonable and necessary to induce the Stalking Horse Bidder to enter into the transactions encompassed by the Stalking Horse APA.

56.      Further, Ligand would not have agreed to act as a stalking horse without the Stalking Horse Protections and the Royalty Assumption, given the substantial time and expense that it incurred in connection with entering into definitive documentation and the risk that it will be outbid at the Auction.  Without the Stalking Horse Protections and the Royalty Assumption, the Debtors might lose the opportunity to obtain the highest or otherwise best offer for the Assets, may have lost the financing for these Chapter 11 Cases, and would certainly lose the downside protection that will be afforded by the existence of the Stalking Horse Bidder.  *See, e.g., In re Enjoy Technology, Inc*., Case No. 22-10580 (Bankr. D. Del. July 26, 2022) [D.I. 199] (approving break-up fee and expense reimbursement).    Additionally, without the floor

established by the Stalking Horse Bidder, the bids received at Auction for the Assets could be substantially lower than the bid offered by the Stalking Horse Purchaser.

57.     Pursuant to the Bidding Procedures, any bidder that wishes to participate in the Auction must submit an offer that is higher or otherwise better than the bid of the Stalking Horse Bidder, which would be used to fund the Stalking Horse Protections.  The bid of the Stalking Horse Bidder attracts additional bidders because, among other things, additional bidders will be able to save considerable time and expense because they can use many of the documents that the Stalking Horse Bidder heavily negotiated, including the Stalking Horse APA and the schedules thereto, in making their bid.  In sum, if the Assets are sold to a Winning Bidder other than the Stalking Horse Bidder, the Sale likely will be the result of the Stalking Horse Bidder's crucial role as an initial bidder generating interest in the Assets and establishing a minimum acceptable price and offer against which other parties can bid.

58.     Finally, the Debtors believe that the amount of the Stalking Horse Protections is appropriate when compared to bid protections approved in other cases in this District.[6] Accordingly, the Debtors submit that the Stalking Horse Protections are reasonable under the circumstances of these Chapter 11 Cases and should be approved.

---

[6]   *See, e.g., In re Am. Eagle Del. Holding Co., LLC*, No. 22-10028 (JKS) [D.I. 146] (approving a breakup fee of 3% of the cash consideration of the stalking horse bid plus expense reimbursements equal to a maximum of 1.25% of the cash consideration of the stalking horse bid capped at $50,000); *In re Ector Cnty. Energy Ctr., LLC*, No. 22-10320 (JTD) (Bankr. D. Del. May 6, 2022) [D.I. 136] (approving breakup fee of 3% of cash consideration of the stalking horse bid plus expense reimbursements equal to a maximum of 0.5% of the cash consideration of the stalking horse bid); *In re BHCosmetics Holdings, LLC*, No. 22-10050 (CS) (Bankr. D. Del. Jan. 28, 2022) [D.I. 90] (approving breakup fee equal to 4% of the cash consideration of the stalking horse bid plus expense reimbursements equal to a maximum of approximately 3.5% of the cash consideration of the stalking horse bid); *In re Gorham Paper & Tissue, LLC*, No. 20-12814 (KBO) (Bankr. D. Del. Nov. 19, 2020) [D.I. 112] (approving break-up fee in an amount equal to approximately 3.4% of cash purchase price and expense reimbursement up to an amount equal to approximately 1.1% of cash purchase price); *In re Brooks Bros. Grp., Inc.*, Case No. 20-11785 (CSS) Bankr. D. Del. Aug. 3, 2020) [D.I. 285] (authorizing a break-up fee of 3% and an expense reimbursement capped at $1 million, for total bid protections of up to 3.3%); *In re Lucky Brand Dungarees, LLC*, Case No. 20-11768 (CSS) (Bankr. D. Del. July 30, 2020) [D.I. 251] (authorizing an expense reimbursement capped at $1 million and a break-up fee of 3% of the sum of the purchase price, credit bid, value of standby letters of credit, and $7 million of assumed liabilities, for total bid protections of approximately 3.5%); *In re Templar Energy LLC*, Case No. 20-11441 (BLS) (Bankr. D. Del. June 29, 2020) [D.I. 130] (authorizing break-up fee of 3% of the cash component of the stalking horse purchase price and expense reimbursement up to $350,000, for total bid protections of approximately 3.5%).

**6.      In the Alternative, the Private Sale to Ligand Should Be Approved**

59.      In the event of a Conversion Trigger Event, the Stalking Horse APA and the DIP Facility require the Debtors to sell the Debtors' Assets to Ligand free and clear of all liens, claims, interests, and encumbrances by private sale.

60.      As illustrated by the terms of the Stalking Horse APA, the Sale will provide value for the Debtors' creditors that would not exist otherwise.   Moreover, the Sale will preserve valuable research and treatments.   Therefore, the Debtors believe that the Stalking Horse APA presents the best opportunity for the Debtors to preserve and maximize the value of its Assets for the benefit of the Debtors, their estate and their creditors.

61.      The Court's general equitable powers are codified in section 105(a) of the Bankruptcy Code.   Section 105(a) empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of this title."   11 U.S.C. § 105(a).   Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).   In pertinent part, Bankruptcy Rule 6004 states that, "[a]ll sales not in the ordinary course of business may be by private sale or by public auction." Fed. R. Bankr. P. 6004(f)(1).

62.      Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, bankruptcy courts routinely authorize sales of a debtor's assets if such sale is based upon the sound business judgment of the debtor. *See, e.g.*, *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Trans World Airlines, Inc.*, No. 01-00056, 2001 Bankr. LEXIS 980, at *29 (Bankr. D. Del. Apr. 2, 2001); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that judicial approval

of a section 363 sale requires a showing that the proposed sale is fair and equitable, a good business reason exists for completing the sale and that the transaction is in good faith).

63.    The proposed Sale pursuant to the Stalking Horse APA, even without an auction, fits squarely within the parameters of the sound business judgment test.  The Stalking Horse APA is the product of arm's length negotiations and brings value to the Debtors' bankruptcy estate and creditors that would not otherwise be available.  The proposed Sale further preserves important pharmaceutical research and development.  Although the Debtors made the Assets available for purchase prior to the Petition Date as part of the Auction, no party other than Ligand was able to agree to a $15 million purchase price and provide the prepetition funding necessary to file these Chapter 11 cases.  Under the circumstances, the consideration to be paid under the Stalking Horse APA is both fair and reasonable.  Therefore, the Debtors believe that the Sale should be approved as a sound exercise of the Debtors' business judgment.

## WAIVER OF BANKRUPTCY RULES 6004(A), 6004(H) AND 6006(D)

64.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Bankruptcy Rule 6006(d) further provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

65.    The Debtors believe that any Sale should be consummated as soon as practicable to preserve and maximize value.  Accordingly, the Debtors request that any Sale Order approving the sale of the Assets and the assumption and assignment of the Assumed Contracts be effective immediately upon entry of such order and that the fourteen-day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived.

## NOTICE

66.     Notice of this Motion will be provided to: (a) the U.S. Trustee; (b) counsel to the Stalking Horse Bidder; (c) the parties included on the Debtors' consolidated list of their 30 largest unsecured creditors; (d) all parties known by the Debtors to assert a lien or encumbrance on any of the Assets; (e) all persons known or reasonably believed to have asserted an interest in or claim to any of the Assets; (f) all persons known or reasonably believed to have expressed an interest in acquiring all or a substantial portion of the Assets within the one (1) year prior to the Petition Date; (g) the Office of the United States Attorney for the District of Delaware; (h) the Office of the Attorney General in each state in which the Debtors have operated; (i) the Office of the Secretary of State in each state in which the Debtors have operated; (j) the Internal Revenue Service and all state and local taxing authorities in the states in which the Debtors have or may have any tax liability; (k) the Securities and Exchange Commission; (l) the Federal Trade Commission; and (m) all other parties that have filed a notice of appearance and demand for service of papers in the Chapter 11 Cases as of the service date.  The Debtors respectfully submit that no further notice of this Motion is required under the circumstances.

## CONCLUSION

**WHEREFORE**, the Debtors respectfully request that the Court (i) enter the Bidding Procedures Order, substantially in the form attached hereto as Exhibit A and grant such other and further relief as the Court may deem just and proper; and (ii) after a Sale Hearing has taken place, enter a Sale Order(s) and grant such other and further relief as the Court may deem just and proper; or (iii) enter the Private Sale Order, substantially in the form attached hereto as Exhibit B and grant such other and further relief as the Court may deem just and proper.

*[Remainder of page intentionally left blank.]*

Dated: July 17, 2023
Wilmington, Delaware

Respectfully submitted,

/s/   Daniel B. Butz
**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Derek C. Abbott (No. 3376)
Daniel B. Butz (No. 4227)
Tamara K. Mann (No. 5643)
Scott D. Jones (No. 6672)
1201 Market Street, 16th Floor
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email: dabbott@morrisnichols.com
           dbutz@morrisnichols.com
           tmann@morrisnichols.com
           sjones@morrisnichols.com


*Proposed Counsel to the Debtors and
Debtors in Possession*