**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: ) | |
| ) | Chapter 11 |
| NOVAN, INC., *et al.*,[1] ) | |
| ) | Case No. 23-10937 (LSS) |
| Debtors. ) | |
| ) | (Joint Administration Requested) |
| ) | |
| ) | **Hearing Date**: TBD |
| ) | **Objection Deadline**: TBD |
| ) | |

**DEBTORS' MOTION FOR ENTRY OF AN
ORDER (I) APPROVING DEBTORS' KEY EMPLOYEE
INCENTIVE PROGRAM AND (II) GRANTING CERTAIN RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby file this motion (the "Motion") for the entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), approving a key employee incentive program ("KEIP") for two key insider employees and authorizing payments contemplated thereunder. In further support of the Motion, the Debtors respectfully state as follows:

**JURISDICTION AND VENUE**

1.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over these Chapter 11 Cases, the Debtors and their estates, and this matter under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

---

[1] The Debtors in these chapter 11 cases, along with the last four digitals of the Debtors' federal tax identification number (if applicable), are: Novan, Inc. (7682) and EPI Health, LLC (9118). The corporate headquarters and the mailing address for the Debtors is 4020 Stirrup Creek Drive, Suite 110, Durham, NC 27703.

2.  Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order with respect to this Motion if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

3.  Venue of these Chapter 11 Cases in this District is proper under 28 U.S.C. §§ 1408 and 1409.

4.  The statutory bases for the relief sought herein are sections 105(a), 363(b) and 503(c) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code").

## BACKGROUND

5.  On the date hereof (the "Petition Date"), the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code (these "Chapter 11 Cases").

6.  The Debtors are authorized to continue operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. As of the date hereof, no trustee, examiner, or official committee of unsecured creditors has been appointed in these Chapter 11 Cases.

7.  Contemporaneously with the filing of this Motion, the Debtors have filed a motion [D.I. 16] (the "Bidding Procedures Motion"), seeking entry of (a) an order (the "Bidding Procedures Order"): (i) approving bidding procedures (the "Bidding Procedures") to be used in connection with one or more sales (each a "Sale") of the Debtors' assets (the "Assets") free and clear of all liens, claims, interests, and encumbrances, (ii) authorizing the Debtors to designate Ligand Pharmaceuticals, Incorporated ("Ligand") as the Stalking Horse Bidder for all of the Assets in connection with considering the entry of the Bidding Procedures Order, (iii) scheduling an auction of the Assets (the "Auction"); (iv) approving the form and manner of service of this Notice of Sale; (v) approving procedures for the assumption and assignment of executory contracts and unexpired leases (collectively, "Assumed Contracts") in connection with any Sale; (vi) approving

- 3 -

the form and manner of service of notice to each relevant non-debtor counterparty to an Assumed Contract (each a "Counterparty") of the proposed assumption and assignment of such Counterparty's Assumed Contract; (vii) scheduling a final hearing to consider approval of the proposed Sale(s) (the "Sale Hearing"); and (vi) granting related relief; and (b) one or more orders (each, a "Sale Order") (i) authorizing a Sale of the Assets free and clear of all liens, claims, interests, and encumbrances; (ii) authorizing the assumption and assignment of certain Assumed Contracts in connection with the approved Sale; and (iii) granting related relief.

8. Additional information regarding the Debtors' business, their capital structure, and the circumstances leading to the filing of these Chapter 11 Cases is set forth in the *Declaration of Paula Brown Stafford in Support of Chapter 11 Petitions and First Day Motions* [D.I. 4] (the "First Day Declaration"),[2] which was filed on the Petition Date and is incorporated herein by reference.

**RELIEF REQUESTED**

By the Motion, pursuant to sections 105(a), 363(b) and 503(c) of the Bankruptcy Code, the Debtors request entry of the Proposed Order, attached hereto as **Exhibit A**, approving the KEIP.

**THE KEIP**

**A.    The Debtors' Need for the KEIP**

9. In the months leading up to the Petition Date, the Debtors initiated various cost-cutting measures to preserve liquidity. These efforts included: implementing pay cuts, not paying discretionary bonuses for calendar year 2022, a reduction in force in May 2023 consisting of 39 employees, reducing discretionary research and development expenses, voluntary reduction

---

[2] Capitalized terms used but not defined herein shall have the respective meanings given to them in the First Day Declaration or the Bidding Procedures Motion, as applicable.

of the CEO's salary, reducing commercial marketing and related expenses, and other restructuring initiatives. The Debtors' remaining employees are critical to the success of these Chapter 11 Cases, which depend entirely on the Debtors' ability to market and consummate value-maximizing sales of their pharmaceutical assets (the "Sale Process").

10. As further explained below, successfully completing the Sale Process within the confines of the Bidding Procedures will require a maximum effort from the Debtors' remaining employees. In the absence of a competent and motivated workforce, the Debtors' prospects for successfully navigating these Chapter 11 Cases would be put in jeopardy.

11. As part of their efforts to retain and motivate remaining employees, the Debtors, with the assistance of their advisors, have determined that their remaining two key executive insider employees (the "KEIP Participants") have institutional knowledge and skills that are critical to both the Debtors' ability to preserve the going concern value of the Debtors' assets and consummate a value maximizing asset sale transaction.

12. Accordingly, the Debtors, after consultation with their advisors and key constituents, have determined that it is appropriate to implement an incentive-based compensation awards program to ensure that the KEIP Participants remain motivated and incentivized to perform their crucial job functions throughout the Sale Process and these Chapter 11 Cases. Given the work remaining to be completed in the Sale Process, and due to the challenges posed by these Chapter 11 Cases, the Debtors and their advisors have determined that the KEIP is necessary to (i) ensure preservation of the going concern value of the Debtors' business and assets, (ii) incentivize the KEIP Participants to create maximum value through the Sale Process for the benefit of all of the Debtors' stakeholders; and (iii) compensate the KEIP Participants at a conservative market level.

**B.     Development of the KEIP**

13.     To develop the terms of the KEIP, the Debtors engaged in a thorough, deliberative process and worked closely with their advisors to ensure that the proposed terms of the KEIP are reasonable, incentivizing, in line with competitive practice for key employee incentive programs implemented in similar cases, and comply with the Bankruptcy Code.

14.     As further described below, each of the KEIP Participants has played, and will continue to play, a key role in the ultimate success of the Sale Process. In addition, these employees are those whose job duties have been disproportionately expanded by these Chapter 11 Cases, requiring them to undertake additional responsibilities and expend significantly more working hours.

15.     The Debtors and their advisors have identified the KEIP Participants as having institutional knowledge of the Debtors' business and unique insight into the Debtors' vendor and customer relationships, employees, management, and operations. In addition to the new responsibilities thrust upon the KEIP Participants in connection with the Sale Process, the KEIP Participants remain responsible for managing the day-to-day operations of the Debtors' business in the face of the many distractions that accompany a chapter 11 filing.

**C.     The KEIP Participants' Job Functions and Roles in the Sale Process**

16.     Each KEIP Participant will play a crucial role in the Sale Process, including by ensuring the Debtors' ability to consummate the Ligand Stalking Horse APA and/or any other asset purchase agreement. Specifically, each KEIP Participant's job function and role in the Sale Process has been, and will continue to be:

- **President & CEO (the "CEO").** The CEO is responsible for determining and executing on the strategic goals of the Debtors under the direction and oversight of Novan, Inc.'s Board of Directors. The CEO also oversees all strategic partner and key customer relationships, all functional areas of development, and all regulatory, finance, legal, commercial, and human resources segments. The CEO has played, and will continue to

- 5 -

play, a crucial role in the Sale Process. Specifically, the CEO is responsible for liaising with all potential purchasers of the Debtors' assets and marketing the existing and future commercial opportunities for the Debtors' assets. The CEO is also essential to ensuring the Debtors' ability to satisfy all of the closing conditions in the Ligand Stalking Horse APA and/or any other asset purchase agreement. Moreover, aside from the Sale Process, the CEO is responsible for overseeing all other aspects of the Debtors' bankruptcy process.

- **Chief Financial Officer (the "CFO").** The CFO is the senior officer responsible for all key areas of the Debtors' finance and accounting functions, including financial planning and analysis and financial reporting. The CFO also oversees the Debtors' business operating plan, financial forecasts and compliance with the DIP financing budget. The CFO is critical for a successful and efficient execution of the Ligand Stalking Horse APA and/or other asset sale transaction, as the CFO must effectively address finance-related diligence requests from prospective buyers and negotiate value maximizing sale transactions.

**D.    Terms of the KEIP**

17. To provide the KEIP Participants with the greatest possible incentive to maximize value during the Sale Process, all payments under the KEIP (the "KEIP Payments") are tied to and will be earned upon the closing of a sales transaction of substantially all of the Debtors' assets. Specifically, upon the closing of the Ligand Stalking Horse APA or any other asset purchase agreement for the sale of the Debtors' assets that contemplates a purchase price of equivalent or greater value, each of the KEIP Participants shall be entitled to a payment in the amount of $175,000.

18. If a KEIP Participant voluntarily resigns, is terminated for cause prior to the date that a KEIP Payment is earned, or accepts an offer of employment with the purchaser of the Debtors' assets, the participant will forfeit the KEIP Payment. The Debtors shall not reallocate any forfeited KEIP Payments to any new or existing KEIP Participants. KEIP Payments will be subject to avoidance, net of payroll related taxes and insurance withholdings, if the KEIP Participant voluntarily terminates employment from the Debtors or is terminated for cause before either of the following dates occur: (i) the effective date of a chapter 11 plan or (ii) the date on

which the Debtors' management informs the KEIP Participant that the KEIP Participant's services are no longer needed.  Forfeited KEIP Payments shall not be reallocated to any new or existing KEIP Participants.

19. KEIP Participants will continue to be eligible for severance benefits in accordance with the Debtors' usual policies and practices and subject to the limitations of the Bankruptcy Code.

20. Any and all payment obligations of the Debtors under the KEIP shall constitute administrative expenses of the Debtors' estates and may be paid pursuant to section 503(b) of the Bankruptcy Code and pursuant to the terms of any orders authorizing use of cash collateral and debtor-in-possession financing entered in these Chapter 11 Cases.

**E.     Reasonableness of the KEIP**

21. Based on the Debtors' understanding of key employee incentive plans approved in other similar cases, the Debtors have concluded that the proposed KEIP is reasonable and justified under the facts and circumstances of these Chapter 11 Cases.  The Debtors believe that the KEIP Participants must be sufficiently incentivized to continue performing their crucial job functions, given that they are tasked with not only navigating the Sale Process, but also remaining responsible for the normal day-to-day management of the Debtors' business during these cases.

22. The KEIP strikes a reasonable balance between the proposed KEIP Payments and the ultimate goal of the incentive program, which is maximizing the proceeds from the Sale Process for the benefit of all of the Debtors' creditors and stakeholders.  The KEIP is also consistent with industry standards.  At most, the KEIP would distribute less than 2.5% of the projected sale proceeds from the Sale Process to the KEIP Participants.  The amount of employees

participating in the KEIP is also fair and reasonable. The KEIP covers a typical number of key "insider" employees as compared to similar programs.

23. Mindful of the financial constraints under which the Debtors operate and the paramount interests of their creditors, the Debtors have carefully tailored the KEIP to encourage the KEIP Participants to maximize the value of the Debtors' assets—thereby maximizing creditor recoveries—all while avoiding unnecessary or excessive incentive payments. Following this extensive process, the disinterested directors of Novan, Inc.'s Board of Directors determined that the KEIP is reasonable and justified under the facts and circumstances of these Chapter 11 Cases.

24. Further, on July 16, 2023, the board of directors for Debtor Novan, Inc. (the "Board") held a meeting at which the compensation committee members of the Board (the "Compensation Committee") were present. The Compensation Committee took advice from advisors and compared analogous situations, after which the Compensation Committee authorized the KEIP.

25. Leading up to the hearing on the Motion, the Debtors will engage in a dialogue with (and address any concerns raised by) their primary constituents, including the U.S. Trustee and any official committee appointed in these cases. The relief requested herein is supported by the Debtors' DIP lender.

## BASIS FOR REQUESTED RELIEF

26. Filing for bankruptcy creates special challenges for companies which may be particularly acute and heightened for debtors who seek to engage in a sale process. A demoralized and reduced workforce can complicate the logistics of preparing for and effectuating a sale process, which in turn makes it more difficult to maximize the value of the assets being sold to the detriment of the estate and interested parties. For this reason, bankruptcy courts have often

authorized incentive plans, so long as they are tailored in an effort to improve morale and incentivize job performance. In this case, the Debtors have designed the KEIP to ensure a successful Sale Process and to maximize the value of their estates. Each of the KEIP Participants is crucial to the success of these Chapter 11 Cases and the Sale Process.

**A.     The KEIP Should Be Approved Pursuant to Section 503(c) of the Bankruptcy Code**

27.     The Debtors submit that the requirements of section 503(c)(3) are satisfied and that the KEIP should be approved. As a threshold matter, the KEIP is not subject to the restrictions set forth in section 503(c)(1) of the Bankruptcy Code because the KEIP is an *incentive* plan, not a *retention* plan. The KEIP incentivizes the KEIP Participants to maximize the value of the Debtors' estates, rather than simply rewarding the KEIP Participants for remaining in the Debtors' employ, by vesting KEIP awards only upon the closing of a sale of substantially all of the Debtors' assets.

28.     As explained above, the Debtors identified the KEIP Participants for participation in the KEIP based on the conclusion that the two KEIP Participants will each play a crucial role in ensuring a successful Sale Process. In addition to their day-to-day responsibilities and the additional tasks associated with facilitating these Chapter 11 Cases, the Debtors have relied upon, and will continue to rely upon, the KEIP Participants to assume additional responsibilities in connection with the Sale Process. Among other things, these additional responsibilities include meeting with potential third-party buyers, assisting in due diligence and resolving other sale-related issues of potential buyers. Moreover, the KEIP Participants—the Debtors' CEO and CFO—are critical to keeping the Debtors' business operating throughout the Sale Process. As a result, the KEIP incentivizes employees that will play key roles in the Debtors' Sale Process to assist the Debtors in completing timely sales that maximize the value of the Debtors' estates for all stakeholders.

29. Because the KEIP Payments are tied to the completion of the Debtors' assets sale, and the KEIP is primarily an incentive plan, the KEIP is not subject to section 503(c)(1) of the Bankruptcy Code, even though it could have some retentive effect. *See In re Glob. Home Prods. LLC*, 369 B.R. 778, 786 (Bankr. D. Del. 2007) (finding that proposed incentive plans were "primarily incentivizing and only coincidentally retentive" and noting, "[t]he fact that . . . all compensation has a retention element d[id] not reduce the Court's conviction" that the debtors' primary goal in approving the incentive plans was "to create value by motivating performance"); *see also In re Dana Corp.*, 358 B.R. 567, 571 (Bankr. S.D.N.Y. 2006) ("[B]ecause a plan has some retentive effect does not mean that the plan, overall, is retentive rather than incentivizing in nature.").

30. The fact that the KEIP Participants will earn their respective shares of the KEIP Payments upon the closing of the Ligand sale transaction, which is already subject to a stalking horse bid, does not alter the incentive nature of the KEIP. As described above, each KEIP Participant has, and will continue to play a crucial role in the Sale Process, including with respect to ensuring the Debtors' ability to consummate the Ligand Stalking Horse APA. Indeed, key employee incentive programs with threshold levels set at or below a stalking-horse bid are often approved as incentive plans in this District.

31. The Debtors' ability to consummate any value maximizing sales of their assets is not a foregone conclusion. A successful closing of the sale transaction will take the continued concerted efforts of the KEIP Participants. Satisfying the closing conditions of the Stalking Horse transaction or an alternative sale transaction will require the incentivized and motivated job performance of the KEIP Participants.

32. Moreover, the outcome of the Sale Process is subject to considerable uncertainty as the Debtors face a number of risks that might affect operations and profitability, which would impact the 363 marketing process. Thus, the KEIP is properly characterized as a performance-based, sale-incentive plan, not a retention plan for insiders subject to the requirements of section 503(c)(1) of the Bankruptcy Code.

33. Further, the KEIP does not constitute severance for the KEIP Participants subject to the provisions of section 503(c)(2) of the Bankruptcy Code, because it does not provide benefits to the KEIP Participants upon termination of their employment with the Debtors. *See* 11 U.S.C. § 503(c)(2). Under the terms of the KEIP, the KEIP Participants will only receive compensation upon consummation of a sale. Therefore, the KEIP is a management and sales-incentive plan—not a severance plan for the KEIP Participants subject to the requirements of section 503(c)(2) of the Bankruptcy Code.[3]

34. Accordingly, the Debtors submit that approval of the KEIP should be analyzed under section 503(c)(3) of the Bankruptcy Code, and the Debtors further submit that the KEIP satisfies the applicable standards thereunder because it is tied to the achievement of a specified goal (consummating value maximizing sales of the Debtors' assets), is fair and reasonable, and does not discriminate unfairly.

**B.    Payment of the KEIP Is a Reasonable Exercise of the Debtors' Business Judgment**

35. Section 503(c)(3) of the Bankruptcy Code requires that contemplated payments to a debtor's employees outside of the ordinary course of business must be "justified by

---

[3] As set forth in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Certain Prepetition Employment Obligations and (B) Maintain Employee Benefits Programs and (II) Granting Related Relief* (the "Wages Motion"), the Debtors have requested that the KEIP Participants will continue to separately be eligible for severance benefits in accordance with the Debtors' usual policies and practices and subject to the limitations of section 503(c)(2) of the Bankruptcy Code.

the facts and circumstances of the case." 11 U.S.C § 503(c)(3). The "facts and circumstances" standard of section 503(c)(3) of the Bankruptcy Code is "no different" than the business judgment standard under section 363(b) of the Bankruptcy Code. *See In re Glob. Home Prods.*, 369 B.R. at 783; *In re Borders Grp., Inc.*, 453 B.R. at 473-74 (citing *In re Dana Corp.*, 358 B.R. at 576); *In re Velo Holdings Inc.*, 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012) (same); *In re Residential Cap., LLC*, 491 B.R. 73, 84 (Bankr. S.D.N.Y. 2013) (same).

36. Section 363(b)(1) of the Bankruptcy Code provides that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estates." 11 U.S.C. § 363(b)(1). Use of estate property outside the ordinary course of business is entrusted to the sound business judgment of a debtor. *See*, *e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d. Cir. 1996) ("[U]nder normal circumstances the [bankruptcy] court would defer to the trustee's [or debtor-in-possession's] judgment so long as there is a legitimate business justification.") (citation omitted); *Computer Sales Int'l, Inc. v. Fed. Mogul Global (In re Fed. Mogul Global, Inc.)*, 293 B.R. 124, 126 (D. Del. 2003) ("[I]n the Third Circuit, a court should approve a debtor's use of assets outside the ordinary course of business if the debtor can demonstrate a sound business justification for the proposed transaction.") (citations omitted). Moreover, once a debtor articulates a valid business justification for the proposed use of estate property, the bankruptcy court should give great weight to that judgment. *See In re Com. Mortg. & Fin., Co.*, 414 B.R. 389, 394 (Bankr. N.D. Ill. 2009) (noting that a debtor in possession "has the discretionary authority to exercise his business judgment in operating the debtor's business similar to the discretionary authority to exercise business judgment given to an officer or director of a corporation") (citations and quotation omitted).

37. In determining whether a compensation plan satisfies the justified-by-the-facts standard under section 503(c)(3) of the Bankruptcy Code, courts consider several factors, including: (a) whether the plan is calculated to achieve the desired performance; (b) whether the cost of the plan is reasonable in the context of a debtor's assets, liabilities, and earning potential; (c) whether the scope of the plan is fair and reasonable or discriminates unfairly among employees; (d) whether the plan is consistent with industry standards; (e) whether the debtor performed due diligence in investigating the need for the plan; and (f) whether the debtor received independent counsel in performing due diligence, creating, and authorizing the plan. *See In re Glob. Home Prods.*, 369 B.R. at 786; *In re Dana Corp.*, 358 B.R. at 576–77 (noting various factors "courts consider . . . in determining if the structure of a compensation proposal and the process for developing the proposal meet the 'sound business judgment' test" under section 503(c)(3)). As set forth below, each of these factors favors approval of the KEIP in these Chapter 11 Cases:

- **The KEIP is Calculated to Achieve the Desired Performance.** The KEIP was designed to maximize the value realized by the Debtors during the Sale Process by incentivizing the KEIP Participants to create value by preserving, marketing, and facilitating the sales of the Debtors' assets. The KEIP's specific goals are to preserve, protect, and maximize the value of the Debtors' assets and to incentivize the KEIP Participants to create value for the Debtors' estates throughout and, in certain cases, following the Sale Process.

- **The Cost of the KEIP is Reasonable.** Implementing the KEIP will cost the Debtors no more than $350,000. Importantly, all of the potential costs of the KEIP are supported by the Debtors' DIP lender. The total cost of the KEIP is also reasonable considering that the Debtors did not pay discretionary bonuses related to 2022 and given the voluntary reduction of the CEO's salary in 2023.

- **The KEIP Provides Incentives That Are Market-Based.** The KEIP Participants are currently receiving only their base salaries. Without the incentive opportunities offered under the KEIP, the total compensation for the KEIP Participants, on average, falls significantly below market.

- **The Debtors Performed Due Diligence in Developing the KEIP and the KEIP is Consistent with Industry Standards.** The Debtors, with the assistance of their advisors, performed diligence to determine the appropriate amount of the KEIP Payments that should be offered to the KEIP Participants, including comparing the KEIP Payments to similar incentive plans of other comparable companies in other chapter 11 cases. The KEIP was ultimately approved by the disinterested members of Novan, Inc.'s Board of Directors. The KEIP is also supported by the Debtors' DIP lender.

- **The Debtors Developed the KEIP Based on Independent Advice and Oversight.** The Debtors actively sought input from independent advisors during the KEIP development process to, among other things: (a) determine the appropriate structure, scope, and size of the KEIP, as well as the appropriate KEIP Payment that should be offered to each KEIP Participant, (b) design the KEIP in a manner that would maximize the value recovered by the Debtors' stakeholders, and (c) maximize the likelihood that the Debtors' most critical insider personnel are incentivized to continue performing their critical job functions throughout the Sale Process and these Chapter 11 Cases.

38. For these reasons, the Debtors respectfully submit that the KEIP is a proper exercise of the Debtors' business judgment, is justified by the facts and circumstances of these Chapter 11 Cases, and satisfies the requirements of section 503(c)(3) of the Bankruptcy Code. The KEIP will incentivize the KEIP Participants to achieve the financial and operational results needed to maximize value for the benefit the Debtors' stakeholders through these Chapter 11 Cases. Accordingly, the Debtors respectfully request that the Court authorize the Debtors to establish the KEIP.

## NOTICE

39. Notice of this Motion will be provided to: (a) the Office of the United States Trustee (Attn: Linda Casey); (b) counsel to the Debtors' proposed debtor in possession financing lender; (c) the Internal Revenue Service; (d) the parties included on the Debtors' consolidated list of their 30 largest unsecured creditors; (e) the United States Attorney for the District of Delaware; (f) the state attorneys general in states where the Debtors are authorized to do business; (g) the Securities and Exchange Commission; (h) the Banks; and (i) all parties entitled to notice pursuant

to Bankruptcy Rule 2002-1.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## **CONCLUSION**

WHEREFORE, the Debtors request that the Court enter the Proposed Order, granting the relief requested herein and such other and further relief as is just and proper.

Dated: July 17, 2023  
Wilmington, Delaware

Respectfully submitted,

*/s/   Daniel B. Butz*  
**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**  
Derek C. Abbott (No. 3376)  
Daniel B. Butz (No. 4227)  
Tamara K. Mann (No. 5643)  
Scott D. Jones (No. 6672)  
1201 Market Street, 16th Floor  
Wilmington, Delaware 19801  
Telephone: (302) 658-9200  
Facsimile: (302) 658-3989  
Email: dabbott@morrisnichols.com  
         dbutz@morrisnichols.com  
         tmann@morrisnichols.com  
         sjones@morrisnichols.com

*Proposed Counsel to the Debtors and Debtors in Possession*